UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                      Case No: 2:15-cr-2-FtM-38CM

THOMAS DAQUAN DERICHO and
CORNELIUS DAVON DERICHO

_____

## REPORT AND RECOMMENDATION[1]

### I.    Background

Before the Court is Defendant Cornelius Dericho's Motion for Pre-Trial

Suppression Hearing ("Motion") (Doc. 47[2]), filed on May 11, 2015, which was referred

by the Honorable Sheri Polster Chappell for a Report and Recommendation.   On May

12, 2015, Defendant Thomas Dericho filed a Motion to Adopt and Join in Applicable

Motions of Co-Defendant, which was granted by Judge Chappell on May 18, 2015.

Docs. 48, 49.   The Government's Response to Defendants' Motion to Suppress was

---

[1] A party failing to file written objections to a magistrate judge's findings or recommendations within fourteen (14) days of issuance of the Report and Recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.   Fed. R. App. P. 3; 11th Cir. R. 3-1; *Mitchell v. U.S.*, No. 14-12271, 2015 WL 2145573, at *3 (11th Cir. May 8, 2015); *See De Souza v. JP Morgan Chase Home Lending Div.*, No. 14-14861, 2015 WL 1868236, at *2 (11th Cir. Apr. 24, 2015).

[2] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

filed on May 20, 2015. Doc. 52. The undersigned held an evidentiary hearing on June 17, 2015. Doc. 72. With the Court's permission, the parties filed general supplemental briefing[3] and memoranda regarding Defendant Thomas Dericho's standing to bring a motion to suppress[4] and, pursuant to Judge Chappell's June 18, 2015 Order (Doc. 73), memoranda relating to Defendant Thomas Dericho's waiver of his presence at the suppression hearing.[5] This case currently is set for the trial term beginning October 5, 2015, with a status conference to be held on September 8, 2015. Docs. 106, 107.

Defendants Cornelius Davon Dericho and Thomas Daquan Dericho are charged in a two-count indictment with conspiracy to possess with intent to distribute 500 grams or more of a mixture of a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(B)(ii)(II), all in violation of 21 U.S.C. § 846 (Count I); and possession with intent to distribute and aid and abet the possession with intent to distribute 500 grams or more of a mixture of a substance

---

[3] The Government's Supplemental Memorandum as to Defendants' Motion to Suppress (Doc. 89), filed on July 17, 2015; the Responding Brief of Cornelius Dericho (Doc. 94), filed on July 22, 2015; Defendant Thomas Dericho's Supplemental Memorandum as to Motion to Suppress (Doc. 98), filed on July 24, 2015; and the Government's Reply to Defendant Thomas Daquan Dericho's Supplemental Memorandum on Motion to Dismiss [sic] (Doc. 100), filed on July 30, 2015.

[4] Defendant Thomas Dericho's Supplemental Brief Regarding Standing of Defendant, Thomas Dericho, Joining Co-Defendant's Motion to Suppress (Doc. 81), filed on June 23, 2015, and the Government's Memorandum of Law (Doc. 82), filed on June 25, 2015.

[5] The Government's Memorandum of Law (Doc. 82), filed on June 25, 2015; Defendant Thomas Dericho's Additional Supplemental Memorandum of Law (Doc. 83), filed on June 25, 2015; Defendant Thomas Dericho's Supplemental Filing Regarding Attendance (Doc. 90), filed on July 17, 2015; and Defendant's Second Supplemental Memorandum as to Motion to the Suppress [sic] (Doc. 101), filed on July 31, 2015.

containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(B)(ii)(II), and 18 U.S.C. § 2 (Count II).   Doc. 3.

Defendants seek to suppress all direct and derivative evidence, including physical evidence and statements, gathered as a result of a traffic stop conducted on Defendant Cornelius Dericho's vehicle by the Florida Highway Patrol ("FHP") on September 17, 2014.   For the reasons that follow, it is respectfully recommended that the Motion be denied.

## II.   Summary of Evidence

The Government called two law enforcement witnesses to testify at the suppression hearing, FHP Troopers Booker Ferrell, Jr. and Michael Grider, and introduced twenty two exhibits, which were admitted into evidence: FHP dash camera video of the September 17, 2014 traffic stop (Gov't Ex. 1); and photographs from the traffic stop (Gov't Exs. 2a-2u).   Doc. 74.   Defendants did not call any witnesses or introduce any exhibits.   The Court finds the following facts based on the testimony and other evidence produced at the hearing.

### a.   Trooper Booker Ferrell, Jr.

At the time of the traffic stop on September 17, 2014, Trooper Ferrell was assigned to FHP's criminal interdiction program.   Doc. 85 at 11.   He was running stationary radar from his vehicle parked near mile marker 94 on the stretch of I-75 known as "Alligator Alley" when he observed a dark colored vehicle in the inside lane that appeared to be speeding.   *Id.* at 11-13.   He confirmed the vehicle's speed at 78 miles per hour ("mph") in a 70 mph zone using radar from his patrol vehicle.   *Id.* at

13.   The dark colored vehicle slowed down to 68 mph upon seeing Trooper Ferrell's vehicle, which drew Trooper Ferrell's attention to the vehicle more than its initial speed.   *Id.* at 13, 100, 107-08.   As the vehicle passed, Trooper Ferrell saw that its windows appeared to be illegally tinted, and he initiated a traffic stop at 11:42:20 a.m.   *Id.* at 14-16, 60.   Trooper Ferrell's dash camera was activated when he turned on his emergency lights.   *Id.* at 15, 60.   The entire traffic stop was recorded.   *See* Gov't Ex. 1.

At 11:42:55 a.m., Trooper Ferrell used a meter to check the tint level on the front passenger and driver's windows and confirmed that they were illegal.   Doc. 85 at 19-20.   He advised the driver, later identified as Defendant Cornelius Dericho ("Cornelius"[6]), that his front windows were too dark.   *Id.* at 17, 19.   Approximately one minute into the stop, Trooper Ferrell approached the window on the passenger side of the vehicle to converse with the occupants and immediately smelled the odor of burnt marijuana coming from the vehicle's interior.   *Id.* at 18.   Trooper Ferrell then had concerns for his safety and separated the driver and passenger.   *Id.* at 62-63.

Trooper Ferrell asked Cornelius to step out of the vehicle with his registration and driver's license at 11:44:05.   *Id.* at 66.   Despite the odor, Cornelius did not appear to be under the influence of marijuana.   *Id.* at 85-86.   The vehicle, a Chevrolet Malibu, was registered to Cornelius Dericho, and he advised Trooper

---

[6] For clarity and ease of reference, because both Defendants have the same last name this Report and Recommendation will refer to each by his first name.

Ferrell that he had owned the car for six months. *Id.* at 18. Cornelius was not detained, and Trooper Ferrell did not place Cornelius in handcuffs despite his safety concerns because he did a "visual scan." *Id.* at 63-64. Trooper Ferrell believed that since Cornelius was wearing loose gym shorts and a "wife beater" shirt, nothing could be concealed in his shirt; and he would have been able to see if there was anything in Cornelius' shorts pockets. *Id.* Cornelius produced a "Class A" commercial motor vehicle license, which allows the driver to operate vehicles over 2,601 pounds. *Id.* at 20-22. Cornelius told Trooper Ferrell that they were traveling from Miami, Florida to Tampa, Florida for a Kevin Gates concert, and going to Orlando. *Id.* at 22, 24, 25.

Trooper Ferrell provided Cornelius' driver's license number to FHP dispatch and requested checks for warrants and criminal history. *Id.* at 23-24. Trooper Ferrell was seated in the passenger seat of his patrol vehicle while Cornelius was standing just outside the door of the vehicle. *Id.* at 27. At 11:45:26 a.m., Trooper Ferrell asked Cornelius if he had ever been arrested, but Cornelius stated he has had no contact with law enforcement other than tickets. *Id.* at 22, 28. Trooper Ferrell found Cornelius was "very talkative," more so than the average motorist, which he thought was "an indication of his nervousness." *Id.* at 28. Trooper Ferrell contacted Trooper Grider, his assigned K9 unit, to respond to his location at 11:48 a.m. *Id.* at 69-70. Trooper Ferrell testified that he did not contact Trooper Grider sooner because he did not have the opportunity to do so until returning to his vehicle. *Id.* at 114. Trooper Ferrell did not immediately search the vehicle because FHP policy prohibits troopers from searching alone. *Id.* at 109, 113, 115.

Trooper Ferrell asked Cornelius several questions about the window tint while awaiting the results of the warrants and license check. *Id.* at 30. The purpose of these questions was to determine whether to issue a citation or only a warning. *Id.* at 111-12. At 11:50:48 a.m., dispatch reported that Cornelius had a valid license and no active warrants, but advised Trooper Ferrell to stand by for criminal history. *Id.* at 31. After the dispatcher reported that Cornelius had some criminal history in Florida, Cornelius admitted he had a criminal history as a juvenile. *Id.* at 32, 33. At 11:50 a.m., while Trooper Ferrell was awaiting further information from dispatch and talking to Cornelius at his patrol car, Trooper Michael Grider and his K9 Jackal arrived on the scene of the traffic stop. Trooper Grider initially is visible on Trooper Ferrell's dash camera at 11:51:30. *Id.* at 33. At 11:51:48 a.m., Trooper Ferrell asked Trooper Grider to retrieve the insurance card, which still was in Cornelius' vehicle, while Trooper Ferrell inquired further about Defendants' trip, including how long they were staying in Tampa, whether they had any bags and whether there was anything illegal in the vehicle. *Id.* at 34-36.

At approximately 11:53 a.m., Trooper Grider retrieved the insurance card, returned to Trooper Ferrell's patrol car and stated "signal 37," which is code for marijuana/drugs. *Id.* at 37-38. Trooper Ferrell had not disclosed to Trooper Grider that he smelled burnt marijuana in the vehicle. *Id.* at 38. Trooper Ferrell asked Cornelius whether he could search his vehicle, but Cornelius did not give a definitive "yes" or "no." *Id.* at 38-39. Trooper Ferrell then approached Cornelius' vehicle to ask the passenger, later identified as Defendant Thomas Dericho ("Thomas"), to exit

the vehicle. *Id.* at 39. Trooper Ferrell asked Thomas whether he and Cornelius had any luggage or bags, about the concert venue and their itinerary. *Id.* at 40-42. Thomas advised that they were not headed anywhere other than Tampa, he did not know where the concert was, they did not have tickets to the concert, and he did not bring any clothes because they were only staying for a couple of days and he planned to stay with his "girl." *Id.* Trooper Ferrell then asked Thomas to step out of the vehicle. *Id.* at 40-41.

At 11:56 a.m., Trooper Ferrell returned Cornelius' registration and informed him that he would be given a warning for the illegal window tint. *Id.* at 43. By this point, Trooper Ferrell had received all information from dispatch, and again asked for consent to search the vehicle. *Id.* at 44-45. He stated, otherwise they were "just going to run the dog around the car" and then Cornelius and Thomas could leave. *Id.* Cornelius did not give a definitive "yes" or "no" answer. *Id.* The K9, Jackal, was already with Trooper Grider at the vehicle. *Id.* at 45-46. Trooper Ferrell believed he had probable cause to search the vehicle as soon as he smelled marijuana when he approached Defendants' vehicle at 11:43 a.m. based upon the smell, Defendants' inconsistent statements about their itinerary, their lack of knowledge regarding details of the concert, the fact that they did not have tickets and were traveling from Miami, a major "source city," via I-75, a major drug corridor. *Id.* at 46-47, 113. Trooper Ferrell also believed he could have searched the vehicle upon Trooper Grider informing him that he smelled marijuana. *Id.* at 102.

Trooper Grider and Jackal walked around Cornelius' vehicle, and Jackal alerted to the presence of narcotics. *Id.* at 149. Trooper Ferrell and Trooper Hinton, another officer who arrived on the scene of the traffic stop, searched the vehicle and found two vacuum sealed plastic bags containing what was later confirmed to be cocaine under the carpet of the center console. *Id.* at 50. Trooper Ferrell discovered the cocaine after he removed the plastic frame from the center console and pulled back the carpet from the floorboard. *Id.* at 50-51. No marijuana or related paraphernalia was found in Defendant's vehicle. *Id.* at 87-89. Trooper Hinton took several pictures of the vehicle at the time of the search, which were identified by Trooper Ferrell at the hearing and admitted into evidence as Government's Exhibits 2a – 2u. Doc. 74. Trooper Ferrell did not advise Cornelius of his *Miranda*[7] rights until he was handcuffed in the back of the police vehicle. Doc. 85 at 84.

### b. Trooper Michael Grider

On September 17, 2014, Trooper Grider was approximately one mile from Trooper Ferrell's unit on I-75 when he received the request to aid Trooper Ferrell. *Id.* at 132. He could not recall whether he first was alerted by radio or saw Trooper Ferrell's chat message. *Id.* Trooper Grider and his K9 Jackal[8] arrived at the scene

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[8] Jackal is a Belgian Malinois who was just over 12 years old at the time of the traffic stop. Doc. 85 at 120-21. He joined FHP in 2005, and is now retired. *Id.* at 121, 126. Jackal was certified for drug detection by the International Forensic Research Institute, specifically for cocaine, cocaine base, heroin, MDMA, marijuana and methamphetamines. *Id.* at 123-24. He was first certified on July 23, 2005, with subsequent certifications each through 2013, except 2010 (Trooper Grider had back surgery and therefore Jackal was not in service). *Id.* at 125-26. Jackal was due for another certification around September 2014. *Id.* at 126.

of the traffic stop at 11:50 a.m. and saw Trooper Ferrell at the side of his patrol car. *Id.* at 133. Trooper Grider approached Trooper Ferrell, who asked him to retrieve the driver's insurance card from the vehicle. *Id.* at 134. Trooper Grider asked Thomas for the insurance card, and Thomas said it was Cornelius' vehicle. *Id.* at 139. Trooper Grider also inquired where they were going and coming from, and Thomas said from Miami to Tampa for a concert. *Id.* at 140.

Trooper Grider smelled the odor of burnt marijuana while standing approximately one to two feet from the front passenger window of Cornelius' vehicle. *Id.* at 140, 155. Trooper Grider did not advise Thomas that he smelled marijuana. *Id.* at 141. Instead, Trooper Grider returned to Trooper Ferrell's vehicle and informed him that he smelled marijuana by using a code. *Id.* Trooper Grider knew that he would deploy Jackal as soon as he smelled marijuana based on the odor and Defendants' nervous behavior, which Trooper Grider described as "taking real deeps breaths, like he was trying to control his nerves." *Id.* at 142-43. He also observed Thomas' hands trembling. *Id.* at 158. Trooper Grider thought Thomas' behavior was unusual because typically there is no reason for a passenger to be nervous during a routine traffic stop. *Id.* at 143.

---

Jackal received a minimum of 32 hours of drug work per month for nine years; as of July 28, 2014, Jackal had performed 3,109 training sniffs since he began working with Trooper Grider. *Id.* at 127-29. Jackal has a 97% operational accuracy rating, which Trooper Grider testified is "extremely high" compared to other FHP K9s. *Id.* at 130. The remaining 3% are "non-confirmed" alerts, which Trooper Grider explained are not necessarily incorrect alerts. *Id.* He testified that Jackal's training accuracy is "a lot higher" than his operational accuracy. *Id.* at 168. Trooper Grider stated that out of the three thousand one hundred and some sniffs, "I don't recall him ever missing one." *Id.* Jackal is certified to perform sniffs on buildings, vehicles and luggage. *Id.* at 131.

- 9 -

After he decided to conduct the dog sniff, Trooper Grider threw grass into the air to establish wind direction for the camera and then he and Jackal walked around Defendants' vehicle.  *Id.* at 147-48.   The dash camera footage shows that Jackal first picked up a scent around the passenger side front bumper, then proceeded down the passenger side toward the rear of the car, made a "u turn" and headed back toward the front of the vehicle, where he gave an alert.  *Id.* at 148-49, 151.   Trooper Grider interpreted Jackal's behavior as shown on the dash camera, and explained that Jackal started walking toward the rear of Cornelius' vehicle but the smell became fainter so he reversed course, walked around the front of the car and then "hit" on the front driver's side door seam.  *Id.* at 149, 152.   Jackal gave his "final response" near the driver's side door by scratching the door to alert troopers to the presence of drugs.  *Id.* at 149-50.   The scratches on the door of the vehicle from Jackal's alert are visible in Government's Exhibit 2u.   Trooper Grider did not advise Defendants of their *Miranda* rights at any time during their encounter.   *Id.* at 160.

## III.   Analysis

### a. *Whether Defendant Thomas Daquan Dericho has standing to challenge the stop and search*

As an initial matter, the Court must determine whether as a passenger Thomas has standing to challenge the traffic stop and search in this case.   Thomas contends that he has standing to challenge both the initial traffic stop and subsequent search.  Doc. 81.   The Government, by contrast, argues that to have standing to challenge a search a defendant must have a possessory interest in the vehicle and demonstrate a reasonable expectation of privacy in the area searched, and here

Thomas forfeited any arguable expectation of privacy when he denied any interest in the vehicle.   Doc. 82 at 6-8.

Thomas relies on *United States v. Houston*, 589 Fed. Appx. 507 (11th Cir. 2015), to challenge both the initial traffic stop and subsequent search of Cornelius' vehicle.   In *Houston*, the Eleventh Circuit affirmed the lower court's denial of the defendant's motion to suppress on grounds that as a passenger, the defendant lacked standing to challenge the search of the vehicle.   *Id.* at 508.   The Eleventh Circuit, citing the United States Supreme Court's opinion in *Brendlin v. California*, stated "Houston was a passenger in the Expedition, but it was not searched following a traffic stop, which Houston could have had standing to challenge."   *Houston*, 589 Fed. Appx. at 508; *Brendlin v. California*, 551 U.S. 249, 255-58 (2007).   The Eleventh Circuit further stated that the defendant was not seized, and the encounter with officers in that case did not trigger scrutiny under the Fourth Amendment to the Constitution.   *Houston*, 589 Fed. Appx. at 508.

In *Brendlin*, the Court determined that "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force of show of authority, terminates or restrains his freedom of movement."   551 U.S. at 254.   Although courts have long recognized that a driver is seized and therefore entitled to Fourth Amendment protections during a traffic stop, *Brendlin* for the first time definitively held that a passenger is seized and thus may challenge the constitutionality of the traffic stop. *Id.* at 251, 257.   The Court stated:

> A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on privacy and personal security does not normally … distinguish between passenger and driver.

*Id.* at 257.   Here, Cornelius' vehicle was pulled over on the side of a highway where cars travel at nearly 80 mph, and Thomas' movements were as limited as those of Cornelius.   Accordingly, the Court finds that Thomas has standing to challenge the traffic stop.

Here, it is undisputed that the front windows of the Malibu were illegally tinted.   Thomas, neither in his briefs nor at the suppression hearing, challenged Trooper Ferrell's determination that the front windows of the vehicle were too dark. Counsel for Cornelius suggested during cross-examination that the tinted windows were merely a pretext to stop the vehicle in order to conduct a drug investigation, but Trooper Ferrell denied the implication.   Doc. 85 at 61.   Even if Trooper Ferrell had subjective intent for stopping Cornelius' vehicle, provided there was probable cause for the stop, any subjective motivation of the officer does not render the stop unreasonable or unconstitutional.   *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

In *Whren*, the Supreme Court noted that its prior decisions "flatly dismissed the idea that an ulterior motive might serve to strip the agents of their legal justification."   *Id.* at 812 (citing *United States v. Villamonte-Marquez*, 462 U.S. 579 (1983)); *see also Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (explaining that

"*Whren* itself relied on *United States v. Robinson* for the proposition that 'a traffic-violation arrest … [will] not be rendered invalid by the fact that it was a mere pretext for a narcotics search.'") (citation omitted); *United States v. Joseph,* --- Fed. Appx. ----, 2015 WL 2190868, at *1 (11th Cir. May 12, 2015) ("As for [the defendant's] first claim—that the traffic stop was unlawful because it was pretextual—the Supreme Court has held that 'the constitutional reasonableness of traffic stops [does not] depend[ ] on the actual motivations of the individual officers involved.   Accordingly, as long as an officer had 'probable cause to believe that a traffic violation … occurred[,]' the traffic stop will be deemed lawful.") (citing *Whren,* 517 U.S. at 810, 813)).

Although a lawful traffic stop does not violate the Fourth Amendment regardless of an officer's subjective intent, an officer may not selectively enforce the traffic laws based on race without running afoul of the Equal Protection Clause. *Whren,* 517 U.S. at 813.   Thomas asserts in his supplemental memorandum that troopers assigned to the criminal interdiction unit "initiate stops of vehicles based on innocent, noncriminal behavior" because they fit a drug courier profile, in violation of the Equal Protection Clause.   Doc. 98 at 4-5.   Specifically with respect to this case, Thomas argues that Trooper Ferrell actually stopped the vehicle in part because Defendants are black.   *Id.* at 5 ("[I]n this case race was a factor that cannot be removed from the totality of the circumstances as the Defendant and Co-Defendant are black in addition to all the other noncriminal behavior utilized by the [criminal interdiction unit] in making this traffic stop.").   Thomas contends that "[t]he policies,

practices and procedures of the [criminal interdiction unit] are discriminatory in nature by observing noncriminal innocent behavior, deeming it to be suspicious of drug trafficking, and conducting traffic stops which will include the use of K-9 units to search for drugs." *Id.* at 5.

Trooper Ferrell had probable cause to initiate the traffic stop based upon the vehicle's speed and his observation that the windows on the Malibu appeared to be illegally tinted.   His subsequent test of the front windows confirmed they were too dark.   No party challenges this fact.   Moreover, upon implication the stop was pretextual during cross-examination by Cornelius' counsel, Trooper Ferrell expressly denied any subjective motivation for the stop.   Doc. 85 at 61.   Trooper Ferrell also expressly denied in response to questions from Thomas' counsel that he would find a vehicle more suspicious based upon its outward appearance or otherwise profile a vehicle or its occupants.   *Id.* at 97-98, 101.   He also testified that he received training on profiling and is aware it is unconstitutional.   *Id.* at 102.   Moreover, there is no evidence in the record that Trooper Ferrell knew the race of the occupants at the time he initiated the traffic stop, or that even if he had it would somehow have affected his decision to stop the vehicle.   There also is no evidence that troopers in the criminal interdiction unit selectively enforce traffic laws for unconstitutional reasons.   Thomas thus has failed to show that Trooper Ferrell's, or any other trooper's, conduct violated the Equal Protection Clause.

Alternatively, Thomas contends that if the policies and practices of the criminal interdiction unit do not violate the Equal Protection Clause, the unit's

standards qualify as an extreme practice under *Wren*.   Doc. 98 at 6.   The Supreme Court in *Wren* noted "seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy" can require additional consideration of an individual's privacy interests even if the traffic stop was lawful.   517 U.S. at 818. Examples of such extraordinary practices are where officers use deadly force; the unannounced, warrantless entry into a home; or physical penetration of an individual's body.   *Id.*   Initiating traffic stops based on perceived (and, in this case, substantiated) violations of Florida's traffic code, without more, can hardly be said to rise to the level of the extreme circumstances enumerated in *Wren*.   Accordingly, the Court does not find the stop unlawful on this basis.

Having heard and observed Trooper Ferrell's testimony during the suppression hearing, and based upon the failure of any party to assert that the Malibu's windows did not violate Florida's traffic code or offer anything beyond accusations that Trooper Ferrell engages in selective enforcement of Florida's traffic laws, the Court finds Trooper Ferrell's testimony to be credible.   Accordingly, the traffic stop was lawful. *Joseph*, 2015 WL 2190868, at *1 (stating district court did not err in crediting officers' testimony and finding traffic stop constitutional where defendant failed to present evidence contradicting officers' testimony at suppression hearing that they stopped the vehicle because the defendant was not wearing a seatbelt in violation of Florida traffic code).

Although the Court has determined that Thomas has standing to challenge the traffic stop, whether he has standing to challenge the search is a separate question.

In *United States v. Lee*, the Eleventh Circuit held that the defendant, a passenger, lacked standing to challenge the search. 586 F.3d 859 (11th Cir. 2009). The court emphasized that "[i]t is well established … that only individuals who have a legitimate expectation of privacy in the area invade may invoke the protections of the Fourth Amendment." *Id.* at 864. Citing its own prior decisions and U.S Supreme Court precedent, the court further explained that it has "held that a 'passenger[ ] in a private car, … who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." *Id.* (quoting *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam) (citing *Rakas v. Illinois*, 439 U.S. 128, 140, 143 n.12 (1978))). Noting that there was "no dispute" the defendant was not the driver or owner of the vehicle, and that the defendant did not assert a possessory or property interest in the vehicle, the court determined that he failed to meet his burden of establishing a legitimate expectation of privacy in the vehicle. *Lee*, 586 F.3d at 864-65. Accordingly, the court held that the defendant's Fourth Amendment claim must fail and affirmed the denial of his motion to suppress. *Id.* at 865.

Here, as in *Lee*, Thomas has not asserted a property or possessory interest in the vehicle. Instead, when questioned by troopers at the scene, Thomas stated that the car belonged to Cornelius. Doc. 85 at 139. At no time during the traffic stop, nor in his briefing to this Court, did Thomas assert any possessory or property interest in the Malibu. Cornelius was driving the vehicle at the time of the traffic

stop, the car was registered in his name and Cornelius admitted to having owned the vehicle for six months prior to the stop.   Accordingly, the Court finds that Thomas, as an occupant in a vehicle he neither owned nor leased and upon failing to otherwise assert any interest in the vehicle, had no expectation of privacy in the Malibu and lacks standing to challenge the search thereof.   *Lee*, 586 F.3d 864-65; *Rakas*, 439 U.S. at 140, 148-49.

> b. *Whether Defendant Thomas Daquan Dericho waived his presence at the suppression hearing*

Although the undersigned has determined that Thomas lacked standing to challenge the search, under *Brendlin* Thomas has standing to challenge the stop. Accordingly, Thomas could have participated in the suppression hearing if he chose to do so.   Instead, at the hearing on Defendants' motion to suppress, counsel for Thomas informed the Court that his client was aware of the hearing, but had work obligations and chose not to attend.   The Court inquired whether the parties wished to proceed in Thomas' absence, and the parties agreed that the hearing should go forward.   Doc. 85 at 5-6; *see also* Doc. 82 at 2, 5; Doc. 83 at 3.

A criminal defendant has the right to be present at all critical stages of the case.   Fed. R. Crim. P. 43.   Rule 43, Federal Rules of Criminal Procedure, enumerates the stages at which a defendant's presence is required, including the initial appearance, arraignment, plea, all trial proceedings and sentencing.   *Id.*   The advisory committee notes to that rule state that a defendant's presence is not required at hearings on pre- or post-trial motions.   Fed. R. Crim. P. 43(a); Fed. R. Crim. P. 43 advisory committee's note.   Evidentiary hearings can be critical stages, however, if

the subject of the hearing relates to the guilt or innocence of the accused.   *United States v. Gradsky*, 434 F.2d 880, 883-84 (5th Cir. 1970).   Where, as here, the evidentiary hearing relates not to the guilt or innocence of the accused but to the admissibility or legality of evidence, a defendant's presence is not required.   *Id.*

At the suppression hearing, Thomas was represented by competent counsel who actively participated in the hearing by cross-examining witnesses, making arguments and objections, and otherwise advocating on behalf of his client.   *See* Doc. 85.   Moreover, since the hearing Thomas' counsel has filed two supplemental documents related to his client's waiver.   Docs. 90, 101.   In those filings, Thomas' counsel certifies that Thomas was aware of the contents of the motion to suppress, discussed the motion with counsel, was aware of the suppression hearing scheduled for June 17, 2015 and knowingly and voluntarily waived his presence.   Doc. 90 at 1. Thomas also certifies that he read and reviewed the transcript of the suppression hearing with counsel, and that he had no additional evidence or direction to provide to his attorney had he been present.   Doc. 101 at 1.

Because pretrial evidentiary hearings that do not relate to the guilt or innocence of an accused are not considered stages at which a defendant's presence is required, a defendant may waive his presence at such hearings provided the waiver is knowing and voluntary.   Here, Thomas' and his attorney's certified statements establish that Thomas' absence from the suppression hearing was knowing and voluntary.   All parties, upon inquiry by the Court at the hearing, agreed that Thomas could and did waive his presence.   Moreover, based on the supplemental

filings by Thomas and his counsel certifying that had he been present there was no additional evidence or action that would have been taken, the undersigned is satisfied that Thomas knowingly and voluntarily waived his presence, and therefore it was appropriate to proceed with the hearing.

### c.  Whether suppression of evidence is warranted

Defendants argue that suppression is required on three grounds.   First, the cocaine must be suppressed because the traffic stop was unreasonably prolonged to allow Trooper Grider to conduct a K9 sniff, in violation of *Rodriguez v. United States*, 135 S.Ct. 1609 (2015).   Defendants also argue that statements made during the course of the unlawfully prolonged traffic stop must be suppressed due to troopers' failure to provide *Miranda* warnings before eliciting the statements, and because Defendants' statements are derivative of, but not sufficiently attenuated from, the unlawful detention.   The Government contends that Trooper Ferrell had reasonable suspicion of illegal activity at the time the traffic stop progressed to a drug investigation, and as a result the traffic stop was not unlawfully prolonged.   The Government also argues that routine traffic stops do not constitute custodial interrogation under *Miranda*, and therefore *Miranda* warnings were not required. Each argument is addressed separately.

### i.  Whether the traffic stop was unlawfully prolonged

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citation omitted).   As discussed in section III.a., *supra*, Trooper Ferrell observed

the Malibu speeding on I-75, which he confirmed with radar, and when the vehicle slowed down he also observed what he believed were illegally tinted windows.   The undersigned already has concluded the traffic stop was lawful at its inception.   The question thus is whether the stop was unlawfully prolonged.

"A seizure justified only by a police-observed traffic violation … 'becomes unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez*, 135 S.Ct. at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).   An officer may check a driver's license, registration and proof of insurance and run a check for outstanding warrants during a traffic stop absent reasonable suspicion because those actions "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 125 S.Ct. at 1615.   A dog sniff, however, "is not an ordinary incident of a traffic stop." *Id.*   Accordingly, if the dog sniff prolongs the traffic stop, reasonable suspicion is required. *Id.* at 1616-17.

Here, the traffic stop commenced at 11:42:20 a.m. Doc. 85 at 60.   Trooper Ferrell testified that as soon as he approached the vehicle he smelled the odor of burnt marijuana. *Id.* at 18.   Trooper Grider also testified that he smelled the odor upon approaching the vehicle to retrieve the insurance card. *Id.* at 140.   The Court finds the troopers' testimony to be credible.   Trooper Ferrell candidly admitted at the suppression hearing that as soon as he neared the window and smelled marijuana, approximately a minute and a half into the stop, the purpose of the stop was converted from that of an ordinary traffic stop to a drug investigation. *Id.* at 111.

Although Trooper Ferrell believed he had probable cause to search the vehicle when he smelled marijuana approximately one minute into the stop, he did not do so for officer safety concerns and because FHP policy prohibits troopers from searching alone.  *Id.* at 109, 113, 115.   Accordingly, the Court finds that the traffic stop was not unlawfully prolonged.   Even assuming, *arguendo*, that the stop was prolonged, the odor of burnt marijuana emanating from the Malibu, plus the Defendants' inconsistent statements about their itinerary, provided the requisite reasonable suspicion to prolong the traffic stop for a drug sniff.

In pre-*Rodriguez* cases, the Eleventh Circuit repeatedly has held that the odor of marijuana creates reasonable suspicion to conduct a dog sniff.[9]   In *United States v. Salley*, the district court adopted the report and recommendation of the magistrate judge, which recommended denying the defendant's motion to suppress on grounds that the odor of marijuana and the defendant's nervous disposition provided reasonable suspicion to conduct a dog sniff.   341 Fed. Appx. 498, 499 (11th Cir. 2009). The Eleventh Circuit affirmed, noting that it "has found reasonable suspicion to support further detention based on, among other things, the 'strong odor of marijuana.'"  *Id.* at 500 (quoting *United States v. Griffin*, 109 F.3d 706, 708 (11th Cir. 1997)).   The court also noted that it "has also found that the smell of marijuana has satisfied the higher 'probable cause' standard.  *Salley*, 341 Fed. Appx. at 500 n.2 (citing *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) (noting it is "clearly

---

[9]  Although the decisions were issued prior to the Supreme Court's decision in *Rodriguez*, that decision did not alter or elaborate upon the requirements for reasonable suspicion or probable cause.

established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search.")).

Although the court noted that a defendant's nervous behavior, without more, is insufficient to support a prolonged detention, such behavior combined with the smell of marijuana supported the district court's conclusion that the officer had reasonable suspicion to warrant further detention to conduct a dog sniff. *Salley*, 341 Fed. Appx. at 500-01. Here, Defendants suggest that the fact that the search of Cornelius' vehicle turned up no marijuana or related paraphernalia calls into question the troopers' statements that they smelled burnt marijuana. *See, e.g.*, Doc. 94 at 8. Trooper Ferrell testified that a lack of actual marijuana or related items in the vehicle is not necessarily inconsistent with smelling the odor; he surmised that marijuana could have been smoked in the vehicle at some point, or that the smell could have been on the occupants' clothes. Doc. 85 at 110. The court in *Salley* rejected a similar argument that that the fact that no marijuana was found meant the officers lacked reasonable suspicion, noting that to the extent the defendant argued the officer's testimony about smelling marijuana should not have been believed, such credibility determination was a decision for the fact-finder. 341 Fed. Appx. at 501 n.4.

Similarly, in *Griffin* the Eleventh Circuit affirmed the district court's denial of defendant's motion to suppress because the search of the vehicle was based upon reasonable suspicion of criminal activity. 109 F.3d at 708. In that case, one officer approached the defendant's vehicle while another officer prepared the traffic citation,

and as the officer approached he smelled a strong odor of marijuana.   *Id.*   The court determined that the odor of marijuana, combined with the three vehicle occupants' inconsistent answers regarding their planned destination, "provided [the officer] with a particularized basis to reasonably suspect that the defendants might be engaged in criminal activity."   *Id.*; *see also United States v. Villarreal*, 565 F.2d 932, 937 (5th Cir. 1978) ("The odor of marijuana detected by [the agent] as emanating from the car furnished him with probable cause to search the trunk."); *United States v. Payne*, 555 F.2d 475, 478 (5th Cir. 1977) ("Having legally stopped the vehicle, the officers had probable cause to search when they detected the odor of marijuana emanating from the interior of the vehicle."); *United States v. Young*, No. 2:08-cr-42-FtM-29SPC, 2008 WL 4790390, at *10 (M.D. Fla. Oct. 30, 2008) ("Additionally, Trooper Heinlein testified that he could smell marijuana when Defendant Young rolled down his window to speak with him.   The smell of marijuana alone gave Trooper Heinlein sufficient 'articulable suspicion of other illegal activity' to detain the Defendants for a period of time longer than that needed to write a speeding ticket.") (order adopting report and recommendation); *Horne v. United States*, No. 2:07-cv-751-FtM-33DNF, 2:05-cr-45-FtM-33DNF, 2008 WL 4665984, at *8 (M.D. Fla. Oct. 21, 2008) ("The odor of marijuana emanating from a vehicle establishes a reasonable suspicion of criminal activity to conduct a search of that vehicle.").

Inconsistent statements about destination also contribute to an objectively reasonable suspicion of illegal activity.   *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) ("A variety of factors may contribute to the formation of an objectively

reasonable suspicion of illegal activity.  Among those factors that have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination."). Defendant's own brief acknowledges that "[t]he factors cited to support a reasonable suspicion, when considered together, must suggest the defendant was engaged in criminal activity other than the reason for the traffic stop." Doc. 47 at 9 n.7 (citing *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)).   When viewed in totality, the Court concludes that they do.

Here, Trooper Ferrell had reasonable suspicion to prolong the traffic stop to conduct a drug sniff upon smelling marijuana as he approached Cornelius' vehicle.[10] That reasonable suspicion existed for the drug sniff was reinforced by Trooper Grider's testimony that he, too, smelled marijuana upon approaching the vehicle, and both troopers' testimony that Cornelius and Thomas provided inconsistent answers about their itinerary and behaved nervously.   Accordingly, the undersigned concludes that troopers did not unlawfully prolong the stop because they had reasonable suspicion to conduct the dog sniff, and therefore the cocaine discovered as the result of that sniff need not be suppressed on this basis.

ii.  Whether *Miranda* warnings were required

Cornelius further contends that he was entitled to *Miranda* warnings because

---

[10] Cornelius concedes as much in his supplemental brief: "Assuming *arguendo* that the Court finds Trooper Ferrell's testimony concerning marijuana smoke credible then, at most, Trooper Ferrell had a reasonable suspicion that criminal activity was afoot."  Doc. 94 at 2 n.4, 5.

he was not free to leave the scene.   He argues that, because "Trooper Ferrell maintained possession of the driver's documentation throughout the stop and commanded the driver to stand in a particular location," and the questions asked by Trooper Ferrell were not related to the objective of the traffic stop, statements made after 11:44:20 must be suppressed.   Doc. 94 at 9.

While it is true that a traffic stop constitutes a seizure, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), the Supreme Court has stated that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody."   *Maryland v. Schatzer*, 559 U.S. 98, 113 (2010); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (routine traffic stops are not custodial stops requiring *Miranda* protections).   *See also United States v. Carson*, 520 Fed. Appx. 874, 886 (11th Cir. 2013) ("[A] person temporarily detained pursuant to an ordinary traffic stop is not 'in custody' for the purposes of *Miranda*.") (citing *Berkemer*, 468 U.S. at 440).

A stopped motorist may be considered "in custody," however, "if he is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest."   *United States v. Crawford*, 294 Fed. Appx. 466, 473 (11th Cir. 2008).   In *Crawford*, the court determined that the defendant was not "in custody" for *Miranda* purposes when he made statements to the officer during the traffic stop, finding persuasive that the defendant was standing at the back of his car in a public parking lot, was not physically restrained, was questioned only briefly and was not told that he would be arrested.   *Id.* at 474.   The court also noted that

- 25 -

there were no other officers present, the defendant was not ordered into a position associated with a formal arrest such as on the ground or against a car, and the officer did not draw his weapon. *Id.* The court therefore concluded that the restraint to which the defendant was subjected at the time he made statements was "the minimal amount necessary for such a stop and did not involve the type of highly intrusive coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *Id.* (quoting *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)).

Even if the officer intends to arrest the suspect, unless he has communicated that intent to the defendant at the time statements are made it would have no bearing on whether the defendant felt free to leave. *Crawford*, 294 Fed. Appx. at 473-74 ("A police officer's unarticulated plan to arrest a suspect has no bearing on whether a reasonable person would have felt a restraint on his freedom associated with arrest."). Here, Trooper Ferrell told Cornelius that they were "just going to run the dog around the car right quick and then you'll be on your way." Doc. 85 at 48. Defendants were not handcuffed, ordered into a prone position or to place their hands on the vehicle, the troopers did not unholster their weapons or point them at Defendants. Thus, although Trooper Ferrell's testimony that he was afraid Defendants would try to flee suggests that perhaps they were not free to leave, the record does not reflect that Defendants were told they could not leave and does not feature the kinds of other inherently coercive behavior that courts have found transform an ordinary traffic stop into a custodial encounter. Accordingly, no *Miranda* warnings were required.

iii.   Whether Defendants' statements are sufficiently attenuated from the unlawful detention

Cornelius further argues that statements elicited by troopers without first administering *Miranda* warnings must be suppressed because the statements were not sufficiently attenuated from the unlawful detention.   Doc. 47 at 14.   Relying on *Kaupp v. Texas*, 538 U.S. 626 (2003), and *Brown v. Illinois*, 422 U.S. 590 (1975), Cornelius argues that the Government failed to meet its burden of establishing that Defendants' statements were sufficiently voluntary and attenuated from the unlawful detention so as to have purged the taint of the Fourth Amendment violations, and therefore any answers he provided to troopers' questions are inadmissible under the Fourth and Fifth Amendments.   Doc. 47 at 13-14; *see also Wong Sun v. United States*, 371 U.S. 471 (1963).   Having already determined, however, that the traffic stop was legal at its inception and not unlawfully prolonged, there was no unlawful detention.   The Court therefore need not reach the question whether any statements are sufficiently attenuated.

## IV.   Conclusion

Defendant Thomas Dericho, as a passenger with no possessory or other property interest in the vehicle and therefore no reasonable expectation of privacy therein, lacks standing to challenge the search of Cornelius' vehicle.   As to Defendant Cornelius Dericho, the Court further concludes the stop was not unlawfully prolonged because the traffic stop had progressed into a drug investigation less than two minutes into the stop.   Alternatively, the Court concludes that the officers had reasonable suspicion to prolong the stop and justify the

subsequent dog sniff.   Once the dog alerted to the presence of narcotics, the officers had probable cause to search the vehicle.   The lawful search revealed the presence of concealed narcotics.   Accordingly, no Fourth Amendment violation occurred. Moreover, Defendants' Fifth Amendment rights were not violated because routine traffic stops do not constitute "custody" for *Miranda* purposes, and even after the stop progressed to a drug investigation, the circumstances surrounding the stop were not coercive or restrictive to the degree associated with formal arrest.   Accordingly, for the foregoing reasons, it is **RESPECTFULLY RECOMMENDED** that Defendant's Motion (Doc. 47) be **DENIED**.

**DONE** and **ENTERED** in Fort Myers, Florida on this 13th day of August, 2015.

CAROL MIRANDO
United States Magistrate Judge

Copies:
The Honorable Sheri Polster Chappell
United States District Judge

Counsel of record